In re John Robert WESTPFAHL and Patricia Ellen Westpfahl, Debtors.

John Robert WESTPFAHL and Patricia Ellen Westpfahl, Plaintiffs,

v.

Michael D. CLARK, Standing Chapter 12 Trustee, and United States of America, acting through Kenneth C. Meeker, United States Trustee for Region 10, Defendants.

In re Thomas Lee FERGUSON and Catherine Ann Ferguson, Debtors.

Thomas Lee FERGUSON and Catherine Ann Ferguson, Plaintiffs,

v.

Michael D. CLARK, Standing Chapter 12 Trustee, and United States of America, acting through Kenneth C. Meeker, United States Trustee for Region 10, Defendants.

In re LaVern Ervin LARSON, a/k/a Bernie Larson, and Marion Jean Street–Larson, Debtors.

In re Rowan Eugene HEBB, Debtor.

In re David A. THOMPSON and Patricia A. Thompson, Debtors.

In re Ralph S. FARWELL, Debtor.

Bankruptcy Nos. 92–82691, 92–91658, 93–81825, 93–80994, 93–82159 and 93–82317.

Adv. Nos. 93–8168, 93–9041.

United States Bankruptcy Court, C.D. Illinois.

May 17, 1994.

Barry M. Barash, Barash & Stoerzbach, Galesburg, IL, for plaintiffs Westpfahls and Fergusons, and Debtors Larsons, Hebb and Thompsons.

Andrew W. Covey, Peoria, IL, for defendant Michael D. Clark, Standing Chapter 12 Trustee.

Michael D. Clark, Chapter 12 Trustee, Peoria, IL.

Robert Lindstrom, Mustain & Lindstrom, Galesburg, IL, for AgriBank, FCB in Farwell.

Jeffrey B. Moorhouse, Califf & Harper, P.C., Moline, IL, for First Midwest Bank in Farwell.

Michael E. Massie, Galva, IL, for Charles Meyers in Larson.

LeAnna L. Karnopp, Vonachen, Lawless, Trager & Slevin, Peoria, IL, for Princeville State Bank in Larson and for Lynne Hebb in Hebb.

Kathleen Butler, Thomson & Weintraub, Bloomington, IL, for Tina Wilson Graves in Larson.

Gerard A. Brost, Asst. U.S. Atty., Peoria, IL, for Commodity Credit Corp. and Farmers Home Admin. in Larson and Farmers Home Admin. in Thompson.

Anne C. Phelps, Rennick & Rennick, Wyoming, IL, for Marcus Plotner in Larson.

Jim Dodge, Springfield, IL, for State of Ill. in Larson.

Paul W. Bridenhagen, Executive Office of the U.S. Trustee, Washington, DC.

Laurie M. Judd, Quinn, Johnston, Henderson & Pretorius, Peoria, IL, for Equitable Agri–Business, Inc., in Thompson.

Kurt J. Horberg, Telleen, Telleen, Braendle, Horberg & Thurman, Cambridge, IL, for State Bank of Annawan in Thompson.

Ronald Weber, Froehling, Taylor & Weber, Canton, IL, for Nat. Bank of Canton in Hebb.

Dale Haake, Katz, McAndrews, Balch, Lefstein & Fieweger, P.C., Rock Island, IL, for Reynolds State Bank in Westpfahl.

John G. Ames, Orion, IL, for Kathryn Curry in Westpfahl.

**OPINION**

WILLIAM V. ALTENBERGER, Chief Judge.

Before the Court are a number of cases which involve the right of a Chapter 12 Debtor to make direct payments to priority and secured creditors without recompense to the Chapter 12 Standing Trustee. In two of those cases, *Thomas Lee Ferguson & Catherine Ann Ferguson,* (FERGUSONS), Case No. 92–91658, and *John Robert Westpfahl & Patricia Ellen Westpfahl,* (WESTPFAHLS), Case No. 92–82691, the Debtors brought adversary proceedings against Michael D. Clark, the Standing Chapter 12 Trustee (Standing Trustee) and the United States of America, acting through Kenneth C. Meeker, the United States Trustee for this region (U.S. Trustee), which are identical, each containing seven counts.[1] In Count 1, the

---

1. Hereinafter, the United States Trustee will be individually referred to as the "U.S. Trustee" and

the Standing Chapter 12 Trustee will be individually referred to as the "Standing Trustee" and

WESTPFAHLS and the FERGUSONS seek a determination from this Court that a Chapter 12 debtor can make direct payments to creditors without the imposition of a trustee's fee. The second count, closely related to the first, requests a finding that a claim which is consensually modified prior to confirmation is not "impaired." Constitutional issues are raised by Counts 3 and 4. The WESTPFAHLS and the FERGUSONS assert that the Office of the United States Trustee and the Standing Trustee's fee are unconstitutional under the Uniformity Clause. Under Count 5 it is alleged that the Chapter 12 Trustee "potentially" may receive excessive compensation. Count 6 involves the method of computing the Standing Trustee's fee. The subject of the final count is the standing order of the Bankruptcy Court for the Central District of Illinois, requiring a Chapter 12 Debtor to deposit $500.00 cash with the Standing Trustee within fifteen days of the filing of the bankruptcy petition. In both adversary proceedings, the United States Trustee filed a motion to dismiss which was joined in by the Standing Trustee. The WESTPFAHLS and the FERGUSONS filed motions to strike the appearance and dismiss the pleadings of the United States Trustee, again asserting the unconstitutionality of the Office of the United States Trustee, and also filed motions for summary judgment

they will be collectively referred to as the "Trustees."

on Count 1 of the complaints, premised upon a perceived change in position by the United States Trustee regarding the permissibility of direct payments. Preliminary confirmation hearings were held in the main case proceedings in WESTPFAHLS and FERGUSONS and most, if not all of the objections filed by creditors have been resolved.

In four of the remaining cases, being *La-Vern Ervin Larson, a/k/a Bernie Larson & Marion Jean Street–Larson*, (LARSONS), Case No. 93–81825; *Rowan Eugene Hebb*, (HEBB), Case No. 93–82159, *David A. & Patricia A. Thompson*, (THOMPSONS), Case No. 93–80994, and *Ralph S. Farwell*, Case No. 93–82317, the issue of the permissibility of direct payments by Chapter 12 debtors arose at the preliminary confirmation hearings held in each of the cases and it was agreed by the parties that these cases would be decided along with the adversary proceedings in the WESTPFAHL/FERGUSON cases. A hearing was held in the WESTPFAHL/FERGUSON cases on October 27, 1993, and the matters were taken under advisement.

THOMPSON Case No. 93–80994

David A. and Patricia A. Thompson (THOMPSONS) filed a Chapter 12 bankruptcy petition on April 23, 1993. According to the plan filed by the THOMPSONS, as amended by stipulations with various creditors, they propose to pay creditors as follows:

DEBTOR THOMPSON

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.& Interest) | ANNUAL PAYMENT | PAYOUT TERM | MANNER OF PAYMENT Direct | MANNER OF PAYMENT Through Trustee | FEE Under Plan | As Computed by Trustee |
|---|---|---|---|---|---|---|---|---|
| PRIORITY | | | | | | | | |
| INTERNAL REVENUE SERVICE | $ 4,303 | 5,100 | 1,700 | 3 Yrs. | | X | 510 | 510 |
| ILLINOIS DEPT. OF REVENUE | 505 | 600 | 200 | 3 Yrs. | | X | 60 | 60 |
| SECURED | | | | | | | | |
| EQUITABLE AGRI-BUSINESS,INC. First Mortgage, real estate | 75,261 | 159,060 | 7,953 | 20 yrs.w/10 yr. balloon | X | | -0- | 2,385 |
| FARMERS HOME ADMINISTRATION, Second Mtg.,real estate | 62,786[1] | 111,375 | 4,455 | 25 Yrs. | X | | -0- | 1,338 |
| COMMODITY CREDIT CORP., 1992 crops. | 27,808 | Unim-paired[2] | | | X | | -0- | -0- |
| STATE BANK OF ANNAWAN, 1992 crops. | 47,648 | Unim-paired | | | X | | | |
| STATE BANK OF ANNAWAN, Machinery & Equipment | 24,350[3] | 30,895 | 6,179 | 5 Yrs. | | X | 1,854 | 1,854 |
| UNSECURED (Including un-secured components of State Bk. of Annawan $76,088 and Farmers Home Administration $45,261) | 162,319 | 3,000 | 1,000 | 3 Yrs. | | X | 300 | 300 |
| TOTAL | | | | | | | 2,724 | 6,447 |

4 A

[1] According to stipulation filed Nov. 18, 1993.

[2] The Thompsons propose to pay the claims of the Commodity Credit Corporation and the State Bank of Annawan, secured by the 1992 crops, directly, in accordance with the pre-petition contracts and they classify those claims as unimpaired.

[3] According to amended stipulation filed Nov. 9, 1993.

The Plan provides that the THOMPSONS will pay the Standing Trustee the sum of $3,000.00 over three years at the rate of $1,000.00 per year and that sum shall be distributed to the unsecured creditors pro rata. The plan also provides that the Standing Trustee's fee is fixed at 10% of the amount he actually distributes to creditors, to be paid concurrently with the payments to creditors as provided in the plan.

A preliminary confirmation hearing was scheduled and objections to the plan were filed by the Chapter 12 Standing Trustee, the Farmers Home Administration, the State Bank of Annawan, and Equitable Agri–Business, Inc. The preliminary confirmation hearing was continued for sixty days and stipulations to accept the plan were entered into by the objecting creditors with the exception of the Chapter 12 Standing Trustee. The objection of the Chapter 12 Standing Trustee is that the plan provides for direct payments by the debtor to impaired creditors and that the plan enables the Court to fix a rate for Trustee's fees which differs from that established by the United States Trustee.

### HEBB Case No. 93–82159

Rowan Eugene Hebb (HEBB) filed a Chapter 12 bankruptcy petition on September 27, 1993. The Chapter 12 plan filed by HEBB, as amended by stipulation, provides for the following payments to creditors:

| DEBTOR HEBB (5 Yr.plan) | | | | | MANNER OF PAYMENT | | FEE | |
| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.& Int.) | ANNUAL PAYMENT | PAYOUT TERM | Direct | Through Trustee | Under Plan | As Computed by Trustee |
|---|---|---|---|---|---|---|---|---|
| **PRIORITY** | | | | | | | | |
| FULTON COUNTY COLLECTOR, Real estate taxes, Tract 1 | $ 470 | 558 | 186 | 3 Yrs. | | X | 54 | 54 |
| FULTON COUNTY COLLECTOR, Real estate taxes, Tract 2 | 1,160 | 1,374 | 458 | 3 Yrs. | | X | 138 | 138 |
| **SECURED** | | | | | | | | |
| UNION NATIONAL BANK, 1st Mtg. Tract 1[1] | 17,975 | 26,170 | 2,617 | 10 Yrs. | X | | -0- | 1,310 |
| NATIONAL BANK OF CANTON, 1st Mtg. Tract 2 | 28,000 | 57,040 | 2,852 | 20 Yrs. | X | | -0- | 1,425 |
| LYNN HEBB, Judgment liens Tracts 1 & 2[1] | 86,240 | | | | | | | |
| FARMERS HOME ADMIN., 1993 crops | 12,215 | Unimpaired[2] | | | X | | -0- | -0- |
| NAT'L. BANK OF CANTON,1993 crops | 55,800 | Unimpaired[3] | | | X | | -0- | -0- |
| SPOON RIVER FS, 1993 crops | 64,335 | Unimpaired[3] | | | X | | -0- | -0- |
| TARTER FEED & FERTILIZER, '93crp. | 32,624 | Unimpaired[4] | | | X | | -0- | -0- |

[1] According to a stipulation filed December 22, 1993. The payments on this claim are to be made on a monthly basis.

[2] HEBB asserts that the junior lien on the real estate held by this former spouse, Lynn Hebb, is a voidable preference and treats her claim as unsecured. An adversary proceeding has been filed and Lynn Hebb contends that the lien is not avoidable. The objection to the plan filed by Lynn Hebb will be taken with that proceeding. See Footnote 2 to text of Opinion for resolution of this adversary proceeding.

[3] HEBB's plan provides that the claims of the Farmers Home Administration, National Bank of Canton, and Spoon River FS, all secured by the 1993 crops, will be paid direct, in accordance with the terms of the prepetition contract and are unimpaired.

[4] While the plan filed by HEBB provides that the cash collateral claim of Tarter Feed & Fertilizer is unimpaired and will be paid in accordance with the prepetition contract, the schedule attached to the plan lists the value of the collateral securing the claim as -0- and shows the full amount of the debt as unsecured.

5A

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FARMERS HOME ADMINISTRATION, Machinery & Equipment | 76,675 | 92,757 | 13,251 | 7 Yrs. | X | | -0- | 6,625 |
| TOMPKINS STATE BANK, Cultivator and mulch finisher | 7,950 | 9,955 | 1,991 | 5 Yrs. | | X | 995 | 995 |
| NATIONAL BANK OF CANTON, pick-up Truck | 6,200 | 7,218 | 2,406 | 3 Yrs. | | X | 720 | 720 |
| DONALD LOWE (landlord), 1993 cash rent | 5,750 | Unimpaired[5] | | | X | | -0- | -0- |
| KEN JOHNSON (landlord), 1993 cash rent | 5,500 | Unimpaired | | | X | | -0- | -0- |
| FREEMAN UNITED COAL CO., 1993 cash rent | 4,320 | Unimpaired | | | X | | -0- | -0- |
| UNSECURED (including claim of Lynn Hebb of $86,40 and Tarter Feed & Fertilizer $32,624) | 148,544 | 55,000 | 11,000 | | X | | 5,500 | 5,500 |
| TOTAL | | | | | | | 7,407 | 16,767 |

5 B

[5]The plan filed provides that the claims of Donald Lowe, Ken Johnson and Freeman United Coal Co., for 1993 cash rent, are unimpaired and will be paid directly by HEBB.

The Plan provides that HEBB will pay the Chapter 12 Trustee the sum of $55,000.00 over five years at the rate of $11,000.00 each year and that amount, less trustee's fees, will be distributed to unsecured creditors, pro rata. The plan also provides that the Chapter 12 Trustee's fee is fixed at 10% of the amount actually distributed to creditors by the trustee.

The matter was set for a preliminary confirmation hearing and objections to confirmation were filed by the Chapter 12 Standing Trustee, the United States Trustee and Lynne Hebb. The objections raised by the Chapter 12 Standing Trustee and the United States Trustee are the same as those raised in *Thompson*, discussed above.[2]

### LARSON Case No. 93–81825

LaVern Ervin Larson, a/k/a Bernie Larson and Marion Jean Street–Larson (LARSONS) filed a Chapter 12 bankruptcy petition on August 9, 1993. Under the terms of their modified plan filed January 25, 1994, the LARSONS propose to pay creditors as follows:

An amended plan is to be filed.

---

2. During the trial held on April 26, 1994, HEBB and his former spouse agreed to a settlement.

DEBTOR: LARSON Modified Plan filed 1-25-94

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.& int.) | ANNUAL PAYMENT | PAYOUT TERM | MANNER OF PAYMENT Direct | MANNER OF PAYMENT Through Trustee | Under Plan | FEE As Computed by Trustee |
|---|---|---|---|---|---|---|---|---|
| PRIORITY | | | | | | | | |
| INTERNAL REVENUE SERVICE | $ 7,000 | 8,295 | 2,765 | 3 Yrs. | | X | 831 | 831 |
| STARK COUNTY COLLECTOR | 2,842 | 3,369 | 1,123 | 3 Yrs. | | X | 336 | 336 |
| PEORIA COUNTY COLLECTOR | 1,298 | 1,539 | 513 | 3 Yrs. | | X | 153 | 153 |
| SECURED | | | | | | | | |
| TRAVELERS INSURANCE CO., First Mortgage real estate tract 1. | 54,500 | 1 | 5,215 | Amort.25 yr. 5 yr.balloon | X | | -0- | 1,566 |
| H.& M. FRITCH, 1st Mortgage, tract 2 | 34,618 | Undet.Varia-ble int.rate | 3,075 | 30 Yrs. | X | | -0- | 924 |
| M.C.TUCKER, Contract seller, tract 3 | 93,990 | FN #1 | 8,349 | Amort.30 yr. 10 yr.balloon | X | | -0- | 2,505 |
| FARMERS HOME ADMINISTRATION, 2nd mortgage | 123,954 | 241,890 | 8,063 | 30 Yrs. | X | | -0- | 2,418 |
| COMMODITY CREDIT CORP., '92 corn & beans | 26,625 | Unimpaired[2] | | | X | | -0- | -0- |
| KRAFT FERTILIZER, 1993 crop | 19,410 | Unimpaired[2] | | | X | | -0- | -0- |
| PRINCEVILLE STATE BANK, 1993 crop[3] | 81,681 | Unimpaired[2] | | | X | | -0- | -0- |
| HENRY KELL (landlord), cash rent | 380 | Unimpaired[2] | | | X | | -0- | -0- |

[1]The Court has not computed the total payment to be received by Travelers Insurance Co. or by Maureen Tucker on their claims. The claim of Travelers is to be amortized over 25 years with interest at 8.25%, with a balloon payment due on February 1, 2000. Tucker's claim is to be amortized over 30 years with interest at 8% with a 10-year balloon.

[2]The claims secured by the 1993 crop are to be paid directly by the LARSONS in accordance with the terms of the prepetition agreements and are classified as unimpaired. The claims of the landlords secured by a landlords' lien on the 1993 crops are unimpaired and are to be paid directly by the LARSONS from the first proceeds of the current crop.

[3]The schedules attached to the LARSONS' plan list the amount of the debt to the Princeville State Bank secured by the 1993 crop as $348,484.00, and show the value of the collateral as $81,681.00. The unsecured component of the claim is listed at $143,600.00 and is included in the unsecured claims in that amount.

6 A

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GEORGE TAYLOR (landlord), cash rent | 8,216 | Unimpaired[2] | | | X | -0- | -0- |
| ROBERT HENDRICK (landlord), cash rent | 4,080 | Unimpaired[2] | | | X | | |
| C & B GERMAN (landlord), cash rent | 4,387 | Unimpaired[2] | | | X | | |
| EJM PARTNERSHIP (landlord), cash rent | 12,450 | Unimpaired[3] | | | X | | |
| PRINCEVILLE STATE BANK, Machinery & equip.[4] | 116,350 | 149,565 | 29,913 | 5 Yrs. | X | -0- | 8,973 |
| PRINCEVILLE STATE BANK, cow herd | 6,853 | 8,810 | 1,762 | 5 Yrs. | X | -0- | 528 |
| UNSECURED | 10,500 | 10,500 | 3,500 | 3 Yrs. | X | 1,050 | 1,050 |
| TOTAL | 179,052 | | | | | 2,370 | 19,284 |

6 B

[4]"The LARSONS' plan provides that certain collateral having a value of $13,850.00 will be surrendered to the Princeville State Bank for a credit against the debt due it in that amount. Whether the Standing Trustee will claim a fee on that amount is not yet clear. This Court has not included such a fee in its computation.

The Plan provides that the LARSONS will pay the trustee the sum of $10,500.00 over three years at the rate of $3,500.00 per year.

WESTPFAHL Case No. 92–82691

John Robert Westpfahl and Patricia Ellen Westpfahl filed a Chapter 12 bankruptcy petition on November 19, 1992. Under the terms of the WESTPFAHLS' plan, as modified by stipulation, they propose to pay creditors as follows:

| DEBTOR: WESTPFAHL CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin. & Int.) | ANNUAL PAYMENT | PAYOUT TERM | MANNER OF PAYMENT | | FEE | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Direct | Through Trustee | Under Plan | As Computed by Trustee |
| **PRIORITY** | | | | | | | | |
| INTERNAL REVENUE SERVICE | $ 4,185 | 5,380 | 1,076 | 5 Yrs. | X | | -0- | 324 |
| ROCK ISLAND CO. COLLECTOR | 1,169 | 1,505 | 301 | | X | | -0- | 90 |
| **SECURED** | | | | | | | | |
| KATHERINE CURRY, 1st mortgage, tract 1 | 80,663 | 124,919 | 8,223[1] | 15 Yrs. | X | | -0- | 2,600 |
| MER-ROC FS, INC., stock & crops [2] | 6,199 | | | 30 days after confirmation | X | | -0- | 620 |
| FORD MOTOR CREDIT CO., pick up truck | 7,825 [3] | 8,829 | 2,943 | 3 Yrs. | X | | -0- | 882 |
| DOONAN IMPLEMENT CO., bulldozer | 2,212 [4] | 2,622 | 874 | 3 Yrs. | X | | -0- | 261 |
| JOHN DEERE CO., tractor & loader | 7,208 [5] | 8,544 | 2,848 | 3 Yrs. | X | | -0- | 855 |
| JOHN DEERE CO., field cultivator | 1,134 | 1,344 | 448 | 3 Yrs. | X | | -0- | 135 |
| BANK ONE, cattle trailer | 3,600 | 4,266 | 1,422 | 3 Yrs. | X | | -0- | 426 |
| BRENTON FIRST NATIONAL BANK, manure spreader | 2,500 | 3,215 | 643 | 5 Yrs. | X | | -0- | 192 |

7 A

[1] According to a stipulation filed March 26, 1993, the WESTPFAHLS will pay Katherine Curry $2,000.00 on confirmation and the payments will be made on a monthly basis.

[2] Pursuant to a stipulation, Mer-Roc FS, Inc. will redeem its stock giving the WESTPFAHLS a credit of approximately $2,465.47. The balance of the claim, secured by 1992 crops, will be paid in full within 30 days of confirmation. Again, the Court is unsure of the fee the Standing Trustee would claim as to this transaction but the Court has computed the fee on the full amount of the claim.

[3] This claim will be paid in monthly installments in accordance with a stipulation filed February 1, 1993.

[4] According to a stipulation filed March 15, 1993.

[5] John Deere Co. entered into a stipulation to accept the plan on March 22, 1993.

| | | | | | | |
|---|---|---|---|---|---|---|
| REYNOLDS STATE BANK, machinery, equipment, hogs and dairy cattle | 185,270 [6] | 27,000 | X | | -0- | 8,100 |
| UNSECURED | 101,504 | 3,000 | | X | 3,000 | 600 |
| TOTAL | | | | | 3,000 | 15,085 |

[6]Pursuant to a stipulation to accept the plan filed April 29, 1993, the combined claim of Reynolds State Bank, secured by machinery and equipment, hogs and dairy cattle is to be paid as follows:
1. Assignment of $2,000 per month from milk checks; provided that by Feb. 1 of each year, a total payment of not less than $27,000 (including total amounts paid throughout the year from milk checks).
2. 100% of the net proceeds from sale of any machinery.
3. 100% of the net proceeds from the sale of any breeding stock that are not replaced.

The WESTPFAHLS propose to pay to the Chapter 12 Standing Trustee the sum of $6,000.00 over three years at the rate of $2,000.00 per year, with $1,000.00 to be paid to the Trustee as fees and the remaining $1,000.00 to be distributed to the unsecured creditors.

FERGUSON Case No. 91–91658

Thomas Lee Ferguson and Catherine Ann Ferguson filed a Chapter 12 bankruptcy petition on March 10, 1993. Their Chapter 12 plan, as modified by stipulation, provides for the following payments to creditors:

| DEBTOR: FERGUSON CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin.& Int.) | ANNUAL PAYMENT | PAYOUT TERM | MANNER OF PAYMENT Direct | MANNER OF PAYMENT Through Trustee | FEE Under Plan | FEE As Computed by Trustee |
|---|---|---|---|---|---|---|---|---|
| **PRIORITY** | | | | | | | | |
| INTERNAL REVENUE SERVICE | $ 39,547 | 50,835 | 10,167 | 5 Yrs. | X | | -0- | 3,051 |
| ILL. DEPT. REV. | 3,453 | 4,440 | 888 | 5 Yrs. | X | | -0- | 267 |
| **SECURED** | | | | | | | | |
| FIRST BANK OF WILMINGTON, 1st Mort.tract 1 | 103,800 | 219,380 | 10,969 | 20 Yrs. | X | | -0- | 3,291 |
| AGRI BANK, FCB, 1st mortgage, tract 2 | 28,755 | 80,280 | 2,676 | 30 Yrs. | X | | -0- | 804 |
| AGRI BANK, FCB, 1st mortgage, tract 3 | 64,341 | 179,610 | 5,987 | 30 Yrs. | X | | -0- | 1,797 |
| FARMERS HOME ADMINISTRATION, '92 crop & equipment, 2d on tract 3 | 38,304 [1] | 64,110 | 4,274 | 15 Yrs. | X | | -0- | 1,281 |
| JOHN DEERE CO., JD7720 combine | 7,581 | 9,745 | 1,949 | 5 Yrs. | X | | -0- | 585 |
| JOHN DEERE CO., flex platform & corn head | 13,297 | 16,416 | 4,104 | 4 Yrs. | X | | -0- | 1,230 |
| JOHN DEERE CO., tractor | 18,966 | 2,380 | 4,876 | 5 Yrs. | X | | -0- | 1,464 |
| FIRST OF AMERICA, tractor & trailer | 20,000 | 22,896 [2] | 7,632 | 3 Yrs. | X | | -0- | 2,289 |
| BANK OF DWIGHT, 2d on machinery & equipment | 26,000 | 32,560 | 6,512 | 5 Yrs. | X | | -0- | 1,953 |

[1] According to a stipulation filed April 22, 1993.

[2] The claim is to be paid in monthly installments.

8 A

| | | | | | |
|---|---|---|---|---|---|
| HOUSEHOLD FINANCE, truck, boat & trailer (stip.April 29, 1993: Int.rate 16.9%; sell collateral immediately pay balance 2-1-94) | 10,081 | 6,000 | 1,000 | X | -0- | 1,008 |
| UNSECURED | 131,553 | | | | X | 3,000 | 600 |
| TOTAL | | | | | | 3,000 | 19,620 |

8 B

---

[3]Pursuant to a stipulation entered into by Household Finance on April 29, 1993, the FERGUSONS agreed to sell the collateral immediately and pay any remaining balance by February 1, 1994. Again, the standing Trustee's position regarding his fee on that transaction is not clear to the Court but for computation purposes the fee has been imposed on the full amount of the claim.

The FERGUSONS propose to pay to the Chapter 12 Standing Trustee the sum of $6,000.00 over three years at the rate of $2,000.00 per year, with $1,000.00 to be paid to the Trustee as fees and the remaining $1,000.00 to be distributed to the unsecured creditors.

### FARWELL, Case No. 93–82317

This is the last case which raises the issue of the right to make direct payments and avoid paying the standing trustee a fee on those direct payments. FARWELL, 84 years old at the time of the filing, proposed to convey a remainder interest in the real estate to his daughter, who has agreed to assume the note to AgriBank, FCB. FARWELL intended to operate and to manage the farm. According to the amended plan filed by FARWELL on March 22, 1994, he proposed to pay creditors as follows:

DEBTOR: FARWELL

| CREDITOR | AMOUNT OF CLAIM | TOTAL PAYMENT (Prin. & Int.) | ANNUAL PAYMENT | PAYOUT TERM | MANNER OF PAYMENT Direct | Through Trustee | FEE Under Plan | As Computed by Trustee |
|---|---|---|---|---|---|---|---|---|
| PRIORITY | | | | | | | | |
| INTERNAL REVENUE SERVICE, employee withholding | 1,001 | 1,001 | To be paid on confirmation | | | X | 100 | 100 |
| SECURED | | | | | | | | |
| AgriBank, FCB,1st Mtg.Tract 1[1] | 68,833 | | 6,400 | 20 Yrs. | X | | -0- | |
| AgriBank, FCB (stock) | Unimpaired | | | | | | | |
| First Midwest Bank, farm Machinery & Equipment | 12,553 | 15,860 | 3,172 | 5 Yrs. | X | | | |
| Ford Motor Credit, 1991 Pickup[2] | | | | | | | | |
| Gehl Finance, Skidster | 1,625 | 1,890 | 630 | 3 Yrs. | X | | | |
| UNSECURED | 98,522 | 2,599 | | | | X | 300 | 300 |

[1]The plan provides that semi-annual payments of $3,200 will be made on May 1st and November 1st. The plan also provides that the Debtor will convey Tract 2 to his daughter, reserving a life estate therein. The daughter will assume the note and pay rent of $2,500 per year to the Debtor.

[2]The Debtor proposes to return the collateral in full satisfaction of the debt.

The plan provides that within 30 days of confirmation, FARWELL will make a one time payment to the Standing Trustee in the sum of $4,000.00. From that amount, the Standing Trustee is to deduct a fee of $400.00, pay the priority claim of the Internal Revenue Service in the amount of $1,001.00, and pay the balance to unsecured creditors.

A preliminary hearing was held on February 4, 1994. Objections to the plan were filed by First Midwest Bank, AgriBank, FCB, the Chapter 12 Standing Trustee and the U.S. Trustee. The objections filed by the Trustees mirror those filed in the above cases. In addition, the Standing Trustee contends that not all projected disposable income is being used for a period of three years, as FARWELL proposes to make only a single payment to unsecured creditors. FARWELL died on April 4, 1994. The objections of First Midwest Bank and Agri-Bank, FCB have been resolved.

## CONSTITUTIONAL CHALLENGES

 The Bankruptcy Clause, Article I, § 8, clause 4, of the United States Constitution provides that Congress shall have the power to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States." This requirement of uniformity has been construed as a requirement of geographic uniformity. *Hanover National Bank v. Moyses,* 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902). It has been deemed satisfied "when existing obligations of a debtor are treated alike by the bankruptcy administration throughout the country, regardless of the State in which the bankruptcy court sits." *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (J. Frankfurter, concurring). In order to pass constitutional muster under the Bankruptcy Clause, a statute "must apply equally to all creditors and all debtors ..." *Blanchette v. Connecticut General Ins. Corporations,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The uniformity requirement does not, however, prevent Congress from taking into account differences that exist between different parts of the country, and to enact legislation directed toward geographically isolated problems. *Id.*

In Count 4 of their complaints, the WESTPFAHLS and the FERGUSONS argue that the exclusion of Alabama and North Carolina from the United States Trustee's system until the year 2002 violates the uniformity requirement of the Bankruptcy Clause. The creation of the U.S. Trustee system was chronicled by the court in *In re Prines,* 867 F.2d 478 (8th Cir.1989):

Congress established the United States Trustee Pilot Program in 1978 to separate—on a trial basis—the administrative and judicial functions previously performed solely by the bankruptcy courts. Ten United States Trustee positions were created in selected federal judicial districts throughout the country, including South Dakota, in order to leave bankruptcy judges "free to resolve disputes untainted by knowledge of administrative matters unnecessary and perhaps prejudicial to an impartial judicial determination." The trustees were given responsibility for many administrative functions, such as appointing private trustees and monitoring their performance, and monitoring cases for signs of fraud or abuse.

The 1986 Act expanded and implemented the trustee program on a nationwide basis. A total of eighteen regional trustee districts were established by combining judicial districts within circuits. While stating the program "provides a great service to our country's bankruptcy system" and should not have to be self-funded, Congress nonetheless believed that "in this time of budget deficit concerns, self-funding becomes a necessity." Hence a United States Trustee System Fund was created, funded primarily through increased filing fees and quarterly trustees fees. Through creation of this fund Congress sought to ensure the trustee program would be paid for "by the users of the bankruptcy system—not by the taxpayer."

. . . .

Subsection (d) [of Section 302] concerns the effective dates of the trustee program in those judicial districts which did not participate in the pilot trustee program. In creating the eighteen district nationwide trustee program, Congress grouped

some non-pilot judicial districts with pilot districts. Subsection (d)(1) provides that the Act's trustee provisions do not become effective or apply to pending cases in non-pilot districts appended to pilot districts until two hundred seventy days after the Act's general effective date or thirty days after the Attorney General certifies the district, whichever occurs first. Congress anticipated the permanent program would be phased in relatively easily in those judicial districts grouped with a district where a pilot program had already been operating.

In trustee districts composed solely of non-pilot judicial districts, section 302(d)(2) provides that the trustee provisions would go into effect two years after the Act's general effective date or thirty days after the Attorney General certifies the district, whichever occurs first. (Citations omitted.)

Section 302(d)(3) of the Act initially provided that Alabama and North Carolina would enter the United States Trustee's System in 1992. That deadline was subsequently extended until October 1, 2002, by the Judicial Improvements Act of 1990 (P.L. No. 101–650). As the U.S. Trustee argued, even if this Court would find that the operation of the United States Trustee System in only 48 states violated the uniformity requirement of the Bankruptcy Clause, the exclusion of North Carolina and Alabama would be declared void and the statute otherwise upheld. As the court noted in *Regan v. Time, Inc.,* 468 U.S. 641, 652–53, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984):

> In exercising its power to review the constitutionality of a legislative Act, a federal court should act cautiously. A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary. As this Court has observed, "whenever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." Thus, this Court has upheld the constitu-

tionality of some provisions of a statute even though other provisions of the same statute were unconstitutional. For the same reasons, we have often refused to resolve the constitutionality of a particular provision of a statute when the constitutionality of a separate, controlling provision has been upheld. Before invalidating the entire statute, we should therefore determine whether the remaining provisions [can survive]

> . . . .

> Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability. " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " (Citations omitted.)

Because the extension at issue here was separately enacted, this standard of severability is unquestionably met.

■ Should this Court so hold that the exclusion of Alabama and North Carolina is unconstitutional and may be separately stricken, that victory would be an empty one for the WESTPFAHLS and the FERGUSONS. Whether the question be termed one of standing or one of jurisprudence, the constitutional issue raised here need not be addressed by this Court. A threshold requirement for a federal court to adjudicate a dispute, is a showing by the party that the alleged injuries will be redressed by a judicial ruling in the plaintiff's favor. *Hinkson v. Phleiderer,* 729 F.2d 697 (10th Cir.1984). A ruling by this Court on Count 4 of the complaints that the extension is void and that Alabama and North Carolina no longer have a dispensation will be of no benefit to the WESTPFAHLS or the FERGUSONS.

■ In Count 3 of the complaint, the WESTPFAHLS and the FERGUSONS allege that the statutory Standing Trustee's fees violates the uniformity required by the Bankruptcy Clause in that it varies throughout the country in amount, in time, between the states and even between trustees within

the same U.S. Trustee region. In support of this contention, the WESTPFAHLS and the FERGUSONS point out in their briefs that the fee is 5% in the District of Nebraska, 7% in the Northern District of Iowa and 10% in the Central District of Illinois. They further assert that once a Chapter 12 Standing Trustee attains his maximum annual compensation, his percentage fee will decrease and thus debtors whose plans are confirmed early in the trustee's fiscal year will fare worse than those debtors whose plans are confirmed on the eve of the new year. Unlike the argument made under Count 4 that the exclusion of Alabama and North Carolina renders the statute unconstitutional on its face, the argument here is that the 28 U.S.C. § 586(e)(1) may be unconstitutional in its application. That section provides:

(e)(1) The Attorney General, after consultation with a United States trustee that has appointed an individual under subsection (b) of this section to serve as standing trustee in cases under chapter 12 or 13 of title 11, shall fix—

(A) a maximum annual compensation for such individual consisting of—

(i) an amount not to exceed the highest annual rate of basic pay in effect for level V of the Executive Schedule; and

(ii) the cash value of employment benefits comparable to the employment benefits provided by the United States to individuals who are employed by the United States at the same rate of basic pay to perform similar services during the same period of time; and

(B) a percentage fee not to exceed—

(i) in the case of a debtor who is not a family farmer, ten percent; or

(ii) in the case of a debtor who is a family farmer, the sum of—

(I) not to exceed ten percent of the payments made under the plan of such debtor, with respect to payments in an aggregate amount not to exceed $450,000; and

(II) three percent of payments made under the plan of such debtor, with respect to payments made after the aggregate amount of payments made under the plan exceeds $450,000; based on

such maximum annual compensation and the actual, necessary expenses incurred by such individual as standing trustee.

(2) Such individual shall collect such percentage fee from all payments received by such individual under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee. Such individual shall pay to the United States trustee, and the United States trustee shall deposit in the United States Trustee System Fund—

(A) any amount by which the actual compensation of such individual exceeds 5 per centum upon all payments received under plans in cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee; and

(B) any amount by which the percentage for all such cases exceeds—

(i) such individual's actual compensation for such cases, as adjusted under subparagraph (A) of paragraph (1); plus

(ii) the actual, necessary expenses incurred by such individual as standing trustee in such cases. Subject to the approval of the Attorney General, any or all of the interest earned from the deposit of payments under plans by such individual may be utilized to pay actual, necessary expenses without regard to the percentage limitation contained in subparagraph (d)(1)(B) of this section.

This provision, referred to in *Collier on Bankruptcy*, as less than clear, was analyzed in detail:

Paragraph (e)(1)(A), as amended in 1990, requires the Attorney General (after consultation with the United State trustee) to fix a salary for each private standing trustee which may not be greater than the rate of basic pay for level V government officials prescribed under the Executive Schedule, plus the cash value of employment benefits comparable to the employment benefits of individuals who are employed at the same rate of basic pay to perform similar services during the same period of time.

The salaries of standing trustees will vary throughout the country depending on

caseloads, economics of the region, attraction of qualified applicants, and other factors. There is no guarantee that the standing trustee will receive the maximum salary fixed by the Attorney General. The income will actually be determined by the percentage fees charged to cases in which the standing trustee serves.

The Attorney General is required to fix a percentage fee, which in chapter 13 cases is not to exceed ten percent, "based on such maximum annual compensation and the actual necessary expenses incurred by such individual as standing trustee." In chapter 12 cases, the fee is not to exceed ten percent of the first $450,000 paid under the plan, and three percent of any payments in excess of $450,000. The percentage fee is intended to cover the maximum salary and actual necessary expenses of the standing trustee. The Attorney General will have to set the percentage fee based on the standing trustee's salary and estimated expenses. The percentage fee charged to each estate will depend on factors such as a projection of the number of cases that will be filed in the ensuing year and the total amount that will be paid out to creditors under confirmed plans. The percentage fee is to be computed on and payable out of the payments actually made by or for a debtor under the plan and may not exceed ten percent of such payments.

Subsection (e)(2) of 28 U.S.C. § 586 requires the standing trustee to collect the percentage fee from all payments received by the trustee under plans in the assigned cases. The standing trustee may use those amounts to pay office expenses and salary, but must turn the excess over to the United States trustee for payment into the United States Trustee System Fund. The amount to be turned over as "excess" is determined according to a specific formula. First, to the extent that payments for the trustee's salary exceed five percent of all payments made in his or her chapter 12 or 13 cases, that amount must be paid over to the United States trustee for payment into the United States Trustee System Fund. This will most likely occur if the number of cases or the dollar amounts in the cases is less than projected. After that determination, the standing trustee must pay to the United States trustee any amount collected to the extent that it exceeds the actual salary plus office expenses for those cases.

Subject to the approval of the Attorney General, the standing trustee may use any interest earned from the deposit of payments under plans to pay actual and necessary expenses without regard to the percentage limitations contained in 28 U.S.C. § 586(e)(1)(B). The compensation and reimbursement for expenses of a standing trustee are governed exclusively by 28 U.S.C. § 586(e). The bankruptcy court may not allow compensation or reimbursement of expenses to the trustee.

The sum and substance of the provisions relating to compensation is that:

1. The percentage fees collected by the standing trustee are to be used (a) to pay the actual necessary expenses as trustee and (b) the salary as fixed by the Attorney General.

2. To the extent that the amount paid on account of salary exceeds five percent of all payments under chapter 12 or 13 plans administered by the trustee, the excess must be paid over to the United States trustee.

3. In addition, the standing trustee must pay to the United States trustee any amount collected through fees to the extent that the amount exceeds actual salary plus office expenses for those cases.

The standing trustee's compensation, therefore, is limited to five percent of all amounts collected through fees, or by the maximum salary fixed by the Attorney General, whichever is lower. Any sums collected in excess of that limitation will be paid into the United States Trustee System Fund to help defray the cost of the United States trustee system.

1 *Collier on Bankruptcy,* ¶ 6.11[1], at pg. 6–60—6–63.

The argument made by the WESTPFAHLS and the FERGUSONS is quite novel. The allowance of expenses of administration, including trustee's fees, has

always been judged by a "reasonableness" standard and has long rested largely within the discretion of the courts and hence, has never been uniform on a trustee by trustee or debtor by debtor basis. *See In the Matter of Schautz,* 390 F.2d 797 (2d Cir.1968). The Bankruptcy Code, and its predecessor, have fixed maximum limits on the compensation of trustees, but the legislative history and the decisions construing those provisions make it clear that the limitations are not grants or entitlements to the maximum fees specified. H.R.Rep. No. 595, 95th Cong., 1st Sess. 327 (1977) 1978 U.S.Code Cong. & Admin.News 5787; *In re Rauch,* 110 B.R. 467 (Bkrtcy. E.D.Cal.1990).

With the creation of the U.S. Trustee System, the business of the fixing of trustees' fees was shifted from the courts to the Attorney General, to be made with the advice of each U.S. Trustee. Rather than have the fees approved on a case-by-case basis, the Attorney General sets a maximum salary for each standing trustee, which is based in large measure upon his caseload. The Attorney General then fixes the percentage fee to be charged by the Standing Trustee, which is intended to cover that trustee's maximum salary and actual expenses. Thus, what the statutory scheme attempts to do is to spread the actual costs of the trustee's services evenly amongst the cases filed in the districts in which the trustee serves, with larger cases bearing a higher fee. This prediction, apparently to be adjusted on an annual basis, will likely not be perfect. But this mechanism represents no departure from past practice—to award the trustee reasonable compensation for the services rendered in each case. While a long-standing, unchallenged history alone is not an earmark of constitutionality, this Court fails to perceive the non-uniformity in the allegations made by the WESTPFAHLS and the FERGUSONS.

Moreover, many of the Debtor's contentions, i.e. that the Attorney General will slash the trustee's fee after the trustee attains his maximum salary, are based upon possibilities and predictions that may never come to pass. Laws are not declared unconstitutional based upon hypothetical situations which have not in fact occurred. *Jones v. Preuit & Maul-*

*din,* 851 F.2d 1321 (11th Cir.1988). Furthermore, the system is structured so that any fees collected by the Standing Trustee in excess of his annual salary are to be paid over to the United States Trustee System Fund to pay other costs of the system. If there is deemed to be an excess in the Fund, the surplus will be deposited in the general fund of the United States Treasury. 28 U.S.C. § 589a(c)(2).

The fallacy of the WESTPFAHLS and the FERGUSONS argument can be seen by carrying it a step or two further. Under their theory, all costs of administration, including attorney's fees, should be absolutely uniform. So viewed, every attorney would charge a standard fee for rendering similar services without variation from Preemption, Illinois to New York City. Reality is to the contrary, however, for attorneys' fees, like other expenses of administration, vary widely, depending upon the circumstances and must be considered and determined on a case by case basis. Reasonableness, and not uniformity, is the criterion for expenses of administration. There is not, nor has there ever been, any precise measure for reasonableness. No challenge is being made here on that basis. Whatever impact the implementation of the U.S. Trustee system has had upon the administration of bankruptcy cases, in this Court's view, it does not violate the uniformity required by the Bankruptcy clause.

## DIRECT PAYMENTS

What forms the heart of all of these cases is the right of a Chapter 12 debtor to make direct payments to priority and secured creditors without imposition of a Chapter 12 Trustee's fee. This issue is one that has been frequently litigated and the courts have reached divergent results. It is a matter of statutory interpretation. It is the position of the United States Trustee and the Chapter 12 Standing Trustee that a trustee's fee must be paid on all payments made under a Chapter 12 plan, unless the payment is made on a secured claim which is unimpaired by the bankruptcy proceeding. The Trustees base their position on 28 U.S.C. § 586(e), set forth above. The Debtors contend that the Bankruptcy Code permits direct payments to

creditors and the statutory provision imposing fees must be applied to the particular payment terms of the Chapter 12 plan.

The Trustees rely on *In re Fulkrod,* 973 F.2d 801 (9th Cir.1992), wherein the court found nothing in Chapter 12 of the Bankruptcy Code which authorizes a debtor to make direct payments to "impaired" creditors and forecasted that if debtors were so permitted Chapter 12 Trustees would receive nothing, a result Congress could never had intended. Giving due import to the explicit language of 28 U.S.C. § 586 and the critical role of the trustee in the Chapter 12 statutory scheme, the court held that Chapter 12 did not authorize a debtor to make payments directly to creditors with modified claims in order to avoid paying the statutory trustee's fee under any circumstances.

The Trustees also rely upon the recent opinion in *In re Marriott,* 161 B.R. 816 (Bkrtcy.S.D.Ill.1993), (*Marriott II*), which reached the same result. In an earlier decision in the same case, *In re Marriott,* 156 B.R. 803 (Bkrtcy.S.D.Ill.1993), (*Marriott I*), the court held that it had no discretion to alter the percentage fee that had been set by the Attorney General under 28 U.S.C. § 586(e). The Marriotts then filed an amended plan, proposing to pay secured creditors directly and to pay unsecured creditors in full, through the standing trustee. Finding the relevant statutes to be somewhat ambiguous, the court sought a cohesive interpretation:

> Section 586(e)(1) provides for assessment of the trustee's percentage fee on payments made "under the plan," while § 586(e)(2) allows for collection of this fee from payments "received by" the trustee under plans. If impaired claims were paid directly by the debtor, the trustee would receive no fee on payments "under the plan," contrary to the plain language of § 586(e)(1). Thus, for § 586(e) to have meaning all payments "under the plan"

must be "received by" the trustee during the period which the trustee serves, with the result that the debtor would make no payments of impaired claims during this period.

. . . .

Thus, an interpretation of § 1225(a)(5)(B)(ii) as referring to the debtor's payment of impaired claims only after completion of the plan period is consistent with both the compensation provision of § 586(e) and the corresponding Chapter 13 provision, as well as with additional Chapter 12 provisions relating to the payment of claims by other than the trustee. *See* 11 U.S.C. §§ 1226(c), 1228(a) and (3) (providing that secured claims on which payments extend beyond the life of the plan survive discharge, to be paid by the debtor after the trustee's dismissal).

The key phrase for the court was "under the plan" which it deemed equivalent to "provided for by the plan" which this Court, as well as many others, has held to mean a claim that is dealt with or modified in any fashion by the debtor's bankruptcy plan. *In re Phillips,* Case No. 90–80233 (unpublished, Sept. 5, 1990). In Chapter 11 the appropriate term is "unimpaired," which is commonly understood to mean that a claim is not dealt with by the plan, i.e. that the legal rights of the claimant are left unaltered. *See* 11 U.S.C. § 1124 and Comment thereto.

This Court has previously held in *In re Lenz,* 74 B.R. 413 (Bkrtcy.C.D.Ill.1987), that a Chapter 12 debtor could make direct payments to a secured creditor on a claim modified under the terms of a plan without paying a trustee's fee under § 326 of the Bankruptcy Code.[3] No issue was raised in that case as to the feasibility of the debtors making the direct payments. Recently, in *Matter of Aberegg,* 961 F.2d 1307 (7th Cir.1992), the court addressed the issue of the debtor's right to make direct payments to creditors

---

3. Section 326(b) in effect at that time provided:
In a case under chapter 12 or 13 of this title, the court may not allow compensation for services or reimbursement of expenses of the United States trustee or of a standing trustee appointed under section 586(b) of title 28, but may allow reasonable compensation under section 330 of this title of a trustee appointed under section 1202(a) or 1302(a) of this title for the trustee's services, payable after the trustee renders such services, not to exceed five percent upon all payments under the plan. 11 U.S.C. § 326(b).

under a Chapter 13 plan. The Abereggs proposed to make their monthly mortgage payments directly to the holder of their residential mortgage. Noting that the standing trustee is only entitled to a statutory commission on funds actually received from the debtor pursuant to the Chapter 13 plan under 28 U.S.C. § 586(e), the court found the language of the statute to be clear and rejected the policy argument made by the standing trustee:

> The Bankruptcy Code contemplates that the debtor and/or his employer will typically transmit the specified portion of the debtor's future income to a Chapter 13 trustee charged with disbursing the monies to creditors pursuant to the plan. This notion is reflected in section 1326(c), which provides that "[e]xcept as otherwise provided in the plan or in the order confirming the plan, the trustee shall make payments to creditors under the plan." This method of disbursement is not exclusive, however, because section 1322(a)(1) requires only that the plan provide for the submission to the trustee of "all *or such portion of future earnings or other future income* of the debtor ... as is necessary for the execution of the plan." 11 U.S.C. § 1322(a)(1) (emphasis added). This language has been uniformly interpreted as giving bankruptcy courts the discretion to permit debtors to make payment directly to some secured creditors, provided that the plan meets all the confirmability requirements set forth in § 1325(a). *See, e.g., Matter of Foster,* 670 F.2d [478] at 487 [ (5th Cir.1982) ]; *In re Jutila,* 111 B.R. [621] at 624–25 [ (W.D.Mich.1989) ]; *In re Burkhart,* 94 B.R. 724 (Bankr.N.D.Fla. 1988) . . . .

> . . . .

Despite the conclusiveness of the above language, we will briefly discuss the Trustee's policy argument. The Trustee's plea that direct-paying debtors will "fritter away" any future earnings left in their control is misplaced, because that concern is effectively addressed by § 1325(a)(6), which bars confirmation of any plan under which the debtor will not be able to make all payments.

The Trustee's interpretation of § 1322(a)(1) is also inconsistent with the basic legislative purpose underlying Chapter 13, which is to provide debtors with a flexible means for repaying creditors: "Chapter 13 is designed to serve as a flexible vehicle for the repayment of part or all of the allowed claims of the debtor. Section 1322 emphasizes that purpose by fixing a minimum of mandatory plan provisions." S.Rep. No. 989, 95th Cong., 1st Sess. 141 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5927, *quoted in Matter of Foster,* 670 F.2d at 486. The benefits of such flexibility are especially compelling here, because the Debtors' current residential mortgage payments will extend beyond the life of the Plan. It would serve little purpose to require the Debtors to disburse their mortgage payments through the Trustee (and to pay the trustee's statutory commission thereon) during the Plan, only to have to arrange to make direct mortgage payments upon the termination of the Plan. *See In re Burkhart,* 94 B.R. at 726. Moreover, [the mortgagee] has not objected to such direct payment, nor would such direct payment generally endanger a mortgagee's security interest. Bankruptcy courts might often find that the mortgagee's interest is so secure that any additional protection afforded by the trustee's disbursement of mortgage payments is unnecessary. *See Matter of Foster,* 670 F.2d at 487.

While the Trustees suggest that the court's holding in *Matter of Aberegg* is limited to payments on secured claims which have not been modified by the debtor's plan, as was concluded by the court in *Marriott II, supra,* this Court finds no such limiting language in the court's opinion. Rather, the court based its opinion on the clear wording of § 1322(a)(1) and § 1326(c) which is identical to the language in § 1222(a)(1) and § 1226(c).

■ This Court, having earlier determined that the language under Chapter 12 permitting direct payments is equally clear, (*In re Lenz, supra* ), and being bound by the court's interpretation in *Matter of Aberegg* that under § 586(e)(2) that a trustee is not entitled to collect a commission on funds disbursed directly by a debtor to a creditor, holds that

a Chapter 12 debtor is not precluded from making direct payments to creditors without recompense to the Chapter 12 standing trustee.

In so holding this Court respectfully disagrees with the court's conclusions in *Marriott II* that the term "under the plan" is controlling and has a universal meaning. Unlike the term "provided for by the plan" which runs throughout the reorganization chapters of the Code, the term "under the plan" was contained only in those provisions regarding trustee's fees. Other courts have held that reliance on the earlier decisions interpreting the trustee's right to deduct a commission from all payments "under the plan" as applying to payments made on all debts, secured or unsecured, whether disbursed by the debtor or by the trustee, is inapposite. In *In re Wright,* 82 B.R. 422 (Bkrtcy.W.D.Va.1988), the court stated:

> Though 28 U.S.C. § 586(e)(2) at first glance seems similar to the former 11 U.S.C. § 1302(e), i.e., keeping the same procedure but transferring the administration thereof from the court to the United States Trustee, the new law contains at least one important substantive difference. In describing the trustee's compensation percentage, the former Section 1302(e)(2) mandated that "[s]uch individual shall collect such percentage fee from all *payments* under plans in the cases under this chapter for which such individual serves as standing trustee." (emphasis added) Such plain language indeed provided the cornerstone for the decision in [In re] *Hankins* [62 B.R. 831 (Bkrtcy.W.D.Va.1986)], *supra.*

> However, the new 28 U.S.C. § 586(e)(2) reads in pertinent part as follows: "Such individuals shall collect such percentage fee from all payments *received by such individual* under plans in the cases under Chapter 12 or 13 of Title 11 for which such individual serves as standing trustee." (emphasis added) Though the legislative history is silent as to why the rules were changed to alter the collection practices of the Chapter 13 trustee, the plain meaning of the words makes it clear that the trustee is to collect commissions only on monies actually received by the trustee pursuant

to the plan. Thus, *Hankins* and *Foster* has been statutorily overruled.

> Notwithstanding the fact that 28 U.S.C. § 586 now vests in the Attorney General the authority to set a maximum 10 percent fee collectible by the trustee "from all payments received," and thus fix the trustee's annual compensation, the bankruptcy court in the confirmation process continues to control what funds are in fact received by the trustee. This court finds nothing in the new legislation indicating any intent to divest its authority to determine in the confirmation process the provisions of the plan pursuant to the guidelines of 11 U.S.C. § 1325.

The flipside of the court's concerns in *Marriott II* that to impose a trustee's fee only on payments "received by" the trustee would render meaningless the "under the plan" language of § 586(e)(1), is that the imposition of a trustee's fee on all payments to creditors provided by the plan, including those made directly by the debtor, would make it impossible for the trustee to collect such a fee from the payments he "receives," thus requiring a construction of § 586(e)(2) which is equally strained. Admittedly, a case might exist where the debtor's cash flow would tolerate the imposition of a percentage fee upon all priority and secured payments, thus allowing a literal application of the statute. This Court has not yet seen such a case, and certainly none of the cases presently before this Court could meet such a burden.

In this Court's view, the starting point must be the language of the Code itself. It sets forth the parameters of a permissible Chapter 12 plan and clearly provides for direct payments of claims by debtors. The Court must then interpret and apply § 586 in light of those provisions. To first look to § 586 to determine what a Chapter 12 debtor may in fact propose in his plan of arrangement is indeed the proverbial "tail wagging the dog." While the statutes cannot admittedly be construed in perfect harmony, this Court reaches a contrary result.

This Court's holding that a Chapter 12 debtor is not precluded from making direct payments to creditors without recompense to the Chapter 12 Standing Trustee does not

completely resolve the issue of a Chapter 12 Standing Trustee's fees. Is the Chapter 12 debtor's right to make direct payments an unfettered right? May a Chapter 12 debtor, by proposing minimum or no payments through the Chapter 12 Standing Trustee, minimize or eliminate the Chapter 12 Standing Trustee's fee?

A Chapter 12 Standing Trustee has duties other than merely receiving payments from a Chapter 12 debtor and making plan payments to creditors. Under Sections 1202, 704, and 1106 of the Bankruptcy Code, 11 U.S.C. §§ 1202, 704, and 1106, the Standing Trustee is charged with a variety of pre and post confirmation duties designed to insure that Chapter 12 cases proceed in accordance with the provisions of the Bankruptcy Code. Some of these duties in some cases will arise unexpectedly post-confirmation.

■ Congress did not intend that a Chapter 12 debtor should control the amount of fees a Chapter 12 Standing Trustee receives by minimizing or eliminating payments to the Chapter 12 Standing Trustee. It intended that a Chapter 12 Standing Trustee be paid for the services provided. As this Court noted in *In re Gaskin,* 79 B.R. 388 (Bkrtcy. C.D.Ill.1987), a Chapter 13 case, a debtor's desire to minimize the statutory trustee's fee is not sufficient justification for the direct payment of secured creditors' claims.

■ Some courts have proffered guidelines for determining when a direct payment should be permitted. In *In re Heller,* 105 B.R. 434 (Bkrtcy.N.D.Ill.1989), the court ruled that a Chapter 12 debtor may make payments directly if the provisions of the Bankruptcy Code allow them and the trustee is adequately compensated, relied upon a list of factors enumerated by the court in *In re Pianowski,* 92 B.R. 225 (Bkrtcy.W.D.Mich. 1988). Those factors are:

1. The past history of the debtor;

2. the business acumen of the debtor;

3. the debtor's post-filing compliance with statutory and court-imposed duties;

4. the good faith of the debtor;

5. the ability of the debtor to achieve meaningful reorganization absent direct payments;

6. the plan treatment of each creditor to which a direct payment is proposed to be made;

7. the consent, or lack thereof, by the affected creditor to the proposed plan treatment;

8. the legal sophistication, incentive and ability of the affected creditor to monitor compliance;

9. the ability of the trustee and the court to monitor future direct payments;

10. the potential burden on the Chapter 12 trustee;

11. the possible effect upon the trustee's salary or funding of the U.S. Trustee system;

12. the potential for abuse of the bankruptcy system;

13. the existence of other unique or special circumstances.

92 B.R. at 233–34. This Court agrees with that approach and finds that each case must be decided on its own facts, and indeed, each claim must be considered individually, as well as the collective impact that the payment of all direct claims will have upon the case. In addition to the factors listed above, there may well be other considerations which need be taken into account in a particular case.

■ That is not to say that there cannot be general guidelines as to specific types of debts. As the court suggested in *Matter of Aberegg, supra,* direct payments may be permissible on secured claims where the creditor enjoys a margin of comfort and the protection afforded by the trustee's disbursement of the payments is unnecessary. Thus, priority claims for real estate taxes may appropriately be paid directly whereas priority claims to the Internal Revenue Service and state taxing authorities should perhaps be paid through the Standing Trustee. Direct payments may properly be permitted on real estate loans but payments on loans secured by machinery and equipment which are highly depreciable should be paid through the Standing Trustee.

Reviewing the various plans before the Court, the Court can discern no rhyme nor reason behind the assigning of certain pay-

ments as being made directly by the debtors and others as being paid through the Trustee. For example, in *FERGUSONS*, priority taxes of almost $43,000.00 are being paid directly by the Debtors. Priority taxes are also being paid directly by the WESTPFAHLS. However, in *HEBB, LARSONS,* and *THOMPSONS,* priority taxes, both income taxes and real estate taxes, are being paid through the Trustee. Moreover, in *HEBB*, one secured creditor having a lien on the Debtor's machinery and equipment is being paid directly by the Debtor while another creditor having a like claim is being paid through the Standing Trustee.

In stark contradistinction to the earlier concerns regarding the constitutional mandate of uniformity raised by the *WESTPFAHLS* and the *FERGUSONS*, the trustee's fees proposed to be paid by the various debtors run the gamut from the 10% of the amount paid over to unsecured creditors (*Thompson, Hebb,* and *Larsons* ), to an equal, dollar for dollar sharing with the unsecured creditors in *WESTPFAHL* and *FERGUSON*. While these differing treatments may be justified based on the facts of each case, it is possible that the standard being applied is what is required to get the plans confirmed with the Chapter 12 trustee being burdened with a reduced fee.

Surely Congress did not envision manipulation or disparate treatment of creditors under the terms of Chapter 12 plans in order to reduce a standing trustee's fee, when it enacted the U.S. Trustee's program. Therefore, a further hearing needs to be held in each of these pending cases to explore the foregoing factors and this Court will not formulate any guidelines until all parties have had an opportunity to develop the record and present their arguments.

 In view of this conclusion, this Court finds that the relief sought in Count 2 of the complaint regarding the consensual modification of claims prior to confirmation begs the issue and becomes, under the above analysis, only one factor to be considered. The WESTPFAHLS and the FERGUSONS, despite the characterization in their plans of

claims as "impaired" or "unimpaired", now suggest that "impairment" is a concept irrelevant to Chapter 12. The Debtors suggest that on confirmation, previously impaired creditors' claims which have been consensually modified become unimpaired. What the Debtors overlook is that such claims have become, at best, "Conditionally" unimpaired, that is, should the Debtors complete the payments under the plan and receive a discharge, the consensually modified claim shall become binding upon both the creditor and the debtor.[4] In those instances where the plan is not completed and the debtors fail to receive a discharge, however, the consensually modified, "unimpaired" claim reverts back to the original pre-petition claim. To the extent that a creditor agrees to a certain treatment under a Chapter 12 plan, conditioned upon successful completion of the plan, the creditor's claim must be considered impaired. A different result would occur where the debtor and the creditor enter into a settlement agreement and the creditor's claim is not dealt with by the debtor's plan of reorganization. *In re Kosmicki*, 161 B.R. 828 (Bkrtcy.D.Neb.1993).

### DOUBLE–DIPPING

 In Count 5 of their complaint, the WESTPFAHLS and the FERGUSONS question the independence of the Chapter 12 Standing Trustee and allege that because Mr. Clark acts as both the Chapter 12 Standing Trustee and the Chapter 13 Standing Trustee, the possibility exists that he may earn in excess of the maximum amount permitted by statute. The following relief is sought by the Debtors:

a. That Mr. Clark's compensation be limited to the maximum annual compensation in effect for level V of the Executive Schedule plus fringe benefits for his combined Chapter 12 and Chapter 13 trusteeships.

b. That Mr. Clark not be permitted to "double dip."

c. That the court examine the expenses incurred by Mr. Clark in discharging

---

**4.** This statement would not apply, however, to those stipulations which incorporate a "drop-dead" clause permitting the creditor to exercise all remedies in the event of default.

his duties as Chapter 12 and Chapter 13 Trustee and determine whether his expenses are actual and necessary.

d. Such other proper relief.

In response, the Trustees contend that this Count should be dismissed because the Debtors have not alleged facts sufficient to demonstrate that they have suffered any harm and thus have failed to show that they have standing to challenge Mr. Clark's compensation. This Court agrees. The Debtors do not allege or contend that Mr. Clark either has or is close to receiving the statutory maximum. Nor is it clear from a reading of the statute that an individual is prohibited from receiving both the maximum amounts as a Chapter 13 Trustee and a Chapter 12 Trustee. The Debtors are seeking an advisory opinion which this Court will not give. Moreover, with the advent of the U.S. Trustee's system, it is not the function of this Court to review the Standing Trustee's expenses.

## A FEE UPON A FEE

 In Count 6 of their complaints, the WESTPFAHLS and the FERGUSONS take issue with the method by which the Chapter 12 Standing Trustee computes his fee, claiming that the fee he actually collects is 11.11% rather than the statutorily authorized 10%. Like the controversy regarding direct payments, this issue has been much litigated and each side finds support in the case law. The statutory provision at issue is 28 U.S.C. § 586(e)(2), which provides that the standing trustee shall collect "such percentage fee from all payments received by such individual under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee." The Trustees argue that the statutory fee should be imposed on all payments received by the standing trustee, including the payments made by the debtors to the trustee to apply on his fee.

The Trustees rely on the recent decision of the Court of Appeals for the Tenth Circuit in *In re BDT Farms, Inc.*, 21 F.3d 1019 (1994), upholding the policy that a Chapter 12 standing trustee is entitled to a percentage of all monies received from the debtor, including the trustee's fee itself:

> When Congress has not directly addressed a specific issue arising in construction of a statute, we must defer to the construction of the statute by the administering agency unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron [, U.S.A., Inc. v. Natural Resources Defense Council, Inc.]* 467 U.S. [837,] at 844 [104 S.Ct. 2778, at 2782, 81 L.Ed.2d 694]. Here, the Executive Office for the U.S. Trustee has construed 586(e) as providing that the standing trustee is entitled to collect a percentage fee of all monies he receives from the debtor, including the trustee's fees. This interpretation is permissible and under the ten percent cap of the statute. Because the statute is ambiguous, we must defer to it.

The premise underlying the rule applied by the court is that proper deference should be given to the agency's expertise. *See Andrade v. Crawford & Co.*, 792 F.Supp. 543 (N.D.Ohio 1992). As the Supreme Court elaborated in *Department of Treasury, IRS v. Federal Labor Relations Auth.*, 494 U.S. 922, 110 S.Ct. 1623, 108 L.Ed.2d 914 (1990):

> As we emphasized in *Chevron,* when an agency is charged with administering a statute, part of the authority it receives is the power to give reasonable content to the statute's textual ambiguities. 467 U.S., at 843–44 [104 S.Ct., at 2781–82]. That is a task infused with judgment and discretion, requiring the "accommodation of conflicting policies that were committed to the agency's care." (Citation). It is not a task we ought to undertake on the agency's behalf in reviewing its orders. (Citation).

This Court is unpersuaded that the rule should apply in this instance where the issue involves only the pocketbook of the U.S. Trustee and its desire to maximize its funds is entitled to no deference.

The standing trustee should not receive a fee for disbursing funds to himself. The pyramidical computation required by such a ruling was noted by the court in *In re Edge*, 122 B.R. 219, 220 (D.Vt.1990):

> The debtor pays the standing trustee $110.00 with $100.00 intended for the cred-

itors under the repayment plan and $10.00 for the standing trustee's 10% fee. The standing trustee then assesses a 10% fee against that additional $10.00 (i.e. $1.00). When the standing trustee receives this additional $1.00, another 10% fee is assessed (i.e., 10% of $1.00). When the standing trustee receives this 10¢, he again assesses a 10% fee (i.e., 1¢). Therefore, the debtor must transfer $111.11 to the standing trustee if creditors are to receive their $100.00 under the Bankruptcy Court's methodology.

The court in *Edge supra*, held that funds paid to a standing trustee for purposes of paying the trustee's percentage fee are not payments under a reorganization plan and are not subject to the trustee's percentage fee. The court held that only payments which are intended to be distributed to creditors pursuant to the plan are payments made "under" the plan. This Court agrees with the reasoning of the court in *Edge* and holds that the proper computation of the trustee's fee is that set forth by the bankruptcy court in *In re BDT Farms, Inc.*, on reconsideration, 152 B.R. 642 (Bkrtcy.W.D.Okl.1993), as follows:

> [T]he proper procedure is to multiply the amount to be paid to creditors under the plan by 1.1. This computation simply adds 10% to the amount to be paid to creditors under the plan. Debtor would pay the resulting amount to Trustee, representing both the payment to be made to creditors under the plan and the percentage fee thereon. The amount remaining after the payment to creditors under the plan would be the percentage fee, which would represent 10% of the payment to creditors. No percentage fee would be collected on the portion of the amount received which represented the percentage fee itself.
>
> When the amount to be paid to creditors is not fixed, such as in the case of a disposable income payment, or where only a partial payment is received, the total amount received should be considered to include the amount to be paid to creditors under the plan plus 10% thereof as the percentage fee. In other words, the amount received should be divided by 1.1.

The result would be the amount payable to creditors and the difference between the two figures would represent the percentage fee of 10% of that amount.

### STANDING ORDER

In Count 7 of the complaints filed by the WESTPFAHLS and the FERGUSONS, they challenge the propriety of the Standing Order of the Bankruptcy Court for the Central District of Illinois, dating back to March 19, 1987, which requires Chapter 12 debtors to deposit $500.00 cash with the Chapter 12 trustee within fifteen days of the filing of their petition. The original purpose of the order was to provide a fund to compensate the Chapter 12 trustee and reimburse him for any expenses incurred, in the event of dismissal or conversion of the case, as well as for payment of other fees and court costs. At the time the order was entered, it was the practice of other bankruptcy courts to require a similar deposit. Debtors were often filing Chapter 12 petitions in order to force the Farmers Home Administration to restructure their farm debts under the Agricultural Credit Act of 1987. Once negotiations began, the Chapter 12 case would be dismissed without any recompense to the Chapter 12 Trustee for the work he had performed and with court costs remaining unpaid. No Standing Trustee had yet been appointed in this region and it was the Court's province to award the Trustee reasonable compensation under § 326. The order continued in force after the appointment of a Standing Trustee by the U.S. Trustee and was unchallenged until these proceedings.

Upon further consideration, this Court concludes that with the United States Trustee program becoming applicable to this Court, there is no longer any reason for the continuation of such an order and it should not be enforced in these cases or any subsequent cases filed in this Court.

To the extent that the Standing Trustee seeks to receive a fee upon payments made to secured creditors in FARWELL, the issue in that case is no different from that raised in the other cases. FARWELL also presents a

different issue in that the Standing Trustee seeks to extend the term of the plan, claiming that by proposing a one-time payment, FARWELL is not committing all of his disposable income for a three-year period as required by § 1222(c) of the Bankruptcy Code. These issues can be resolved at the scheduled continued confirmation hearing.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in the Opinion entered this day;

IT IS HEREBY ORDERED:

1. That the partial Motion for Summary Judgment as to Count 1 of the Adversary Complaints filed by the WESTPFAHLS and the FERGUSONS is ALLOWED, this Court holding that a Chapter 12 Debtor may make payments directly to priority or secured creditors without imposition of the Chapter 12 Standing Trustee's fee when specifically authorized by the Court, after due consideration of the particular circumstances of each case;

2. That the Motions to Dismiss the FERGUSON and WESTPFAHL Adversary Complaints filed by the Trustees are ALLOWED as to Counts 2, 3, 4 and 5, and DENIED as to Count 1, in both proceedings;

3. That the Motion to Dismiss the FERGUSON and WESTPFAHL Adversary Complaints filed by the Trustees is DENIED as to Count 6, this Court finding that the matter involved in that Count presents only a legal issue and, treating the Trustees' Motion to Dismiss as a Motion for Summary Judgment, hereby enters judgment in favor of the WESTPFAHLS and FERGUSONS;

4. That the Motions to strike the appearance and dismiss the pleadings of the U.S. Trustee filed by the FERGUSONS and the WESTPFAHLS in the adversary proceedings are hereby DENIED;

5. That the standing order of the Bankruptcy Court for the Central District of Illinois dated January 6, 1993, requiring Chapter 12 Debtors to deposit $500.00 with the Chapter 12 Trustee within 15 days of the filing of a petition is not to be enforced. Accordingly, Count 7 of the WESTPFAHL and FERGUSON Adversary Complaints is hereby DISMISSED; and

6. That the Clerk of the Court is directed to set final confirmation hearings in each of the cases to permit the parties to present evidence or argument regarding the direct payment of claims by the Debtors.